


**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
07/07/2009

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 06-35903-H4-11** |
| **SUPPLEMENT SPOT, LLC,** | § | |
| | § | **Chapter 11** |
| **Debtor**. | § | |
| | § | |
| | § | |

| | | |
|---|---|---|
| **BEN B. FLOYD, Chapter 11 Trustee,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Adversary No. 08-03279** |
| | § | |
| **OPTION ONE MORTGAGE** | § | |
| **CORPORATION,** | § | |
| **Defendant.** | § | |
| | § | |

**MEMORANDUM OPINION ON TRUSTEE'S COMPLAINT TO RECOVER
FRAUDULENT CONVEYANCES**
[Adv. Docket No. 1]

## I. INTRODUCTION

Ben B. Floyd (the Trustee), the Chapter 11 Trustee for the debtor in the above-referenced

Chapter 11 case, Supplement Spot, LLC (the Debtor), brought this adversary proceeding to avoid

transfers by the Debtor to Option One Mortgage Corporation (Option One or the Defendant)

totaling $90,668.08 under 11 U.S.C. § 548(a)(1)(B) and the Texas Business and Commerce Code

§ 24.006(a).[1] [Adv. Docket No. 1.]  The Trustee argues that the transfers to Option One were

fraudulent because: (1) the account from which the funds were transferred (the Amegy Account)

was the Debtor's property; (2) the Debtor received less than reasonably equivalent value in

---

[1] Any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

exchange for the funds that the Debtor transferred to Option One; and (3) the Debtor was insolvent at the time the transfers were made. The Defendant argues that the Trustee has not met his burden of proof and contends there is insufficient evidence that the Amegy Account is, in fact, the property of the Debtor, rather than the personal property of Marcella Ortega (Ortega), who was president of the Debtor when the transfers occurred. The Defendant also argues there is insufficient evidence to prove that the value received by the Debtor from Option One was less than reasonably equivalent value in exchange for the transfers.

In order to prevail, the Trustee must first prove the elements of fraudulent transfer under either § 548(a)(1)(B) of the Bankruptcy Code or § 24.006(a) of the Texas Business and Commerce Code. Second, the Trustee must prove that he is entitled to recovery of the transfers made to the Defendant. The Trustee seeks to recover pursuant to either § 542(a) of the Bankruptcy Code or §§ 24.008(a) and 24.010(a)(2) of the Texas Business and Commerce Code. Alternatively, the Trustee seeks to recover under a constructive trust theory.

The Court concludes that the Trustee has presented sufficient evidence to satisfy all the elements of fraudulent transfers pursuant to § 548(a)(1)(B) of the Bankruptcy Code and § 24.006(a) of the Texas Business and Commerce Code. Additionally, the Court also concludes that the Trustee may recover $63,582.20 pursuant to §§ 24.008(a) and 24.010(a)(2) of the Texas Business and Commerce Code. Furthermore, the Court awards the Trustee pre-judgment interest on the amount that is recovered from the date the complaint was filed until the date judgment is rendered. Further, this Court awards post-judgment interest on the amount that is recovered from the date the judgment is rendered until the date the judgment is satisfied. The Court will also

award the Trustee reasonable attorneys' fees and costs, and interest will accrue on these costs until the judgment is satisfied.

## II. Credibility of Witnesses

During trial, the Trustee called two witnesses: Ben B. Floyd (i.e. the Trustee himself), and James Smith (Smith), the accountant for the Debtor's estate who testified as an expert witness. The Court finds the testimony given by both of these witnesses to be very credible. The Defendant called no witnesses, but rather chose to argue in closing that the Trustee had failed to carry his burden of proof.

## III. Findings of Fact

1.  The Debtor was originally formed in June, 2002 as a Texas limited liability company. [Adv. Docket No. 26: Joint Pretrial Statement, p. 5.] The Debtor began operating in 1997 under the name "Young Again Nutrients," as a sole proprietorship of Ortega.

2.  The Debtor is in the business of selling nutritional supplements and related products primarily though its internet web site http://www.suplementspot.com. Because the Debtor's business is primarily operated through its internet web site, most of the receipts are received through credit and debit card payments. These funds are received though a merchant services agreement and posted to the Amegy Account (Account Number 141351), an account originally held by Klein Bank & Trust and subsequently held by Amegy Bank. [Adv. Docket No. 26: Joint Pretrial Statement, p. 5.] This account has been maintained by the Trustee so as to not interrupt the credit card payment receipts, which are the Debtor's primary source of payments for sales by the Debtor. [Adv. Docket No. 14: Notice of Filing Expert Report, p. 3 of the Report.]

3

3.  The name of the Amegy Account is "Marcella Ortega dba Young Again Nutrients." [Adv. Docket No. 26: Joint Pretrial Statement, p. 5.]

4.  The Amegy Account (i) is listed as an asset of the Debtor in its amended Schedule B, [Adv. Docket No. 26: Joint Pretrial Statement, p. 5]; (ii) was used by the Debtor as a business account, [Adv. Docket No. 26: Joint Pretrial Statement, p. 5]; (iii) contained funds generated exclusively by the Debtor's business, [Testimony of Trustee and Smith]; and (iv) was turned over to the Trustee as a debtor-in-possession account upon his appointment by Ortega and John Acord[2] on February 28, 2007, [Testimony of Trustee]. The Debtor's schedules and amended schedules are signed by Ortega, in her capacity as president of the Debtor. [Case No. 06-35903, Docket Nos. 1, 30, & 88.]

5.  On April 11, 2003, Ortega executed a Home Equity Note payable to Option One in the principal amount of $336,000.00 (the Home Equity Note). The Home Equity Note is secured by real property located at 9022 Deer Lodge Road, Magnolia, Texas 77354 (the Deer Lodge Property). [Adv. Docket No. 26: Joint Pretrial Statement, p. 5.] Option One continues to be the present owner and holder of the Home Equity Note.

6.  On November 23, 2004, Ortega and one of her sons, Sean Ortega, executed an Adjustable Rate Note payable to WMC Mortgage Corporation in the original principal amount of $672,000.00 (the Adjustable Rate Note). The Adjustable Rate Note is secured by real property located at 1919 Cattle Drive, Magnolia, Texas 77354 (the Cattle Drive Property), and Option One has been the owner and holder of this note for all periods of

---

[2] John Acord, also known as John Livingston, *see infra* Finding of Fact No. 11, is a son of Ortega and an employee of the Debtor.

time referred to in the complaint. [Adv. Docket No. 26: Joint Pretrial Statement, p. 6; Testimony of Trustee.]

7. The Debtor is neither a signatory to, nor obligated under, the Home Equity Note or the Adjustable Rate Note. Likewise, the Debtor has never had an ownership interest in the Deer Lodge Property or the Cattle Drive Property. [Testimony of Trustee.]

8. The Debtor made the following pre-petition payments to Option One from the Amegy Account (the Payments) on account of either (i) the Home Equity Note secured by the Deer Lodge Property; or (ii) the Adjustable Rate Note secured by the Cattle Drive Property. [Adv. Docket No. 26: Joint Pretrial Statement, p. 6; Testimony of Smith.] The Payments benefitted only Ortega and Sean Ortega. [Testimony of Trustee.]

| Transaction Date | Bank Clear Date | Transaction Type | Payment Amount |
|---|---|---|---|
| 08/14/03 | | 5702 | $133.99 |
| 08/25/03 | | 7662 | $2,233.16 |
| 09/02/03 | | 7683 | $2,367.13 |
| 09/08/03 | | 7697 | $2,233.16 |
| 09/17/03 | | 7725 | $2,233.16 |
| 09/19/03 | | 8536 | $2,233.16 |
| 10/01/03 | | 8554 | $2,233.16 |
| 10/02/03 | | 8599 | $2,233.16 |
| 10/20/03 | | 9200 | $2,253.16 |
| 12/02/03 | | 9385 | $2,233.16 |
| 01/13/04 | 01/13/04 | 9779 | $2,233.16 |
| 06/08/04 | 06/08/04 | 167 | $4,466.32 |
| 08/16/04 | 08/16/04 | 10354 | $4,416.32 |
| 09/01/04 | 09/01/04 | 10361 | $2,233.16 |
| 09/15/04 | 09/15/04 | 10434 | $2,233.16 |
| 09/29/04 | 09/29/04 | 10495 | $2,233.16 |
| 10/12/04 | 10/12/04 | 10551 | $2,233.16 |
| 10/27/04 | 10/27/04 | 10613 | $2,233.16 |
| 01/05/05 | 01/05/05 | 10878 | $1,443.38 |
| 01/05/05 | 01/05/05 | 10879 | $4,024.66 |

| | | | |
|---|---|---|---|
| 01/05/05 | 01/05/05 | 10881 | $2,233.16 |
| 02/03/05 | 02/03/05 | 10987 | $2,233.16 |
| 03/09/05 | 03/09/05 | 11136 | $2,333.16 |
| 04/08/05 | 04/08/05 | Debit | $2,233.16 |
| 05/04/05 | 05/04/05 | Debit | $2,233.16 |
| 06/02/05 | 06/02/05 | Debit | $2,233.16 |
| 06/29/05 | 06/29/05 | Debit | $2,233.16 |
| 08/09/05 | 08/09/05 | Debit | $2,233.16 |
| 09/09/05 | 09/09/05 | Debit | $2,233.16 |
| 10/06/05 | 10/06/05 | Debit | $2,233.16 |
| 11/07/05 | 11/07/05 | Debit | $2,233.16 |
| 12/06/05 | 12/06/05 | Debit | $2,233.16 |
| 01/10/06 | 01/10/06 | Debit | $2,233.16 |
| 02/15/06 | 02/15/06 | Debit | $2,233.16 |
| 03/15/06 | 03/15/06 | Debit | $2,235.16 |
| 05/16/06 | 05/16/06 | Debit | $2,233.16 |
| 07/12/06 | 07/12/06 | Debit | $2,233.16 |
| 07/25/06 | 07/25/06 | Debit | $2,233.16 |
| 09/13/06 | 09/13/06 | Debit | $2,233.16 |
| | | **TOTAL** | **$90,668.08** |

9.  Option One was never a creditor of the Debtor.   [Testimony of Trustee]; *see also* [Trustee's Ex. 18: Claims Register.]

10. The Deer Lodge Property was identified as the Debtor's address in its Articles of Organization executed on June 14, 2002. [Adv. Docket No. 26: Joint Pretrial Statement, p. 6.]

11. Ortega leased the Deer Lodge Property from October 10, 2003 until October 31, 2004 to a third party, her son, also known as John Livingston. [Testimony of Trustee]; *see also* [Defendant's Ex. 6: Lease Agreement.]

12. Ortega resided at the Deer Lodge Property and claimed it as her homestead from 2004 to 2006. [Adv. Docket No. 26: Joint Pretrial Statement, p. 6.]

6

13. Ortega identified the Cattle Drive Property as the Debtor's principal place of business from 2004 to 2006. [Testimony of Trustee]; *see also* [Trustee's Ex. 8: Debtor's 2005 Franchise Tax Public Information Report.]

14. On November 23, 2004, Ortega claimed the Cattle Drive Property as her primary residence. [Testimony of Trustee.]

15. Ortega currently resides at the Cattle Drive Property. [Adv. Docket No. 26: Joint Pretrial Statement, p. 6.]

16. Neither the Deer Lodge Property nor the Cattle Drive Property was ever used to benefit the Debtor's business. Therefore, the Debtor received no benefit from the Payments. [Testimony of Trustee.]

17. Young Again Products, Inc. (YAP) was a creditor of the Debtor as early as July 2003. In 1999, YAP entered into an agreement with the Debtor pursuant to which the Debtor distributed YAP's products over the internet. On April 4, 2007, YAP filed a proof of claim against the Debtor for damages arising between July 2003 and 2006. [Proof of Claim No. 8.] These damages arose from two separate lawsuits involving a breach of contract claim and trademark infringement and unfair competition claims. YAP claimed damages ranging between $800,000.00 and $5.3 million. Taking into consideration the detailed claims analysis contained within the proof of claim and the extensive settlement negotiations between the Trustee and YAP, Smith estimated that YAP would recover $1.5 million from these lawsuits. [Testimony of Smith]; *see* [Trustee's Ex. 19: Proof of Claim]; *see also* [Trustee's Ex. 13: Insolvency Analysis, Explanation of Adjustments.]

18. A report prepared by Smith indicates that as of June 30, 2003, the Debtor had liabilities in excess of assets in the amount of $1,160,206.00. Smith specifically attributed the Debtor's insolvency to the debt owed to YAP. [Testimony of Smith]; *see* [Trustee's Ex. 13: Report of Trustee's Accountant.]

19. The Debtor filed a voluntary Chapter 11 petition on November 3, 2006. [Case No. 06-35903, Docket No. 1.] The Trustee was appointed as the Chapter 11 Trustee by an Order entered on March 1, 2007. [Case No. 06-35903 Docket No. 100.]

### IV. CONCLUSIONS OF LAW

**A.    Jurisdiction and Venue**

The Court has jurisdiction over the Adversary Proceeding, pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (H), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *In re Ginther Trusts*, No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").[3] Venue is proper pursuant to 28 U.S.C. § 1409.

---

[3] The Court acknowledges that a fraudulent transfer suit filed under the Texas Uniform Fraudulent Transfer Act (the TUFTA) is not a proceeding that could arise only in the context of a bankruptcy case. However, a fraudulent transfer suit filed under 11 U.S.C. § 548 is such a proceeding, and this is why this particular adversary proceeding is a core proceeding under the general "catch all" language of 28 U.S.C. § 157(b)(2).

**B.      Preemption**

The Trustee has brought an action for recovery of fraudulent transfers under both federal and state law.  There are four applicable statutes under federal law.  The first is Section 542(a), which states that an entity in possession of property of the debtor's estate must turn over that property to the Trustee for the benefit of the creditors of the estate.  11 U.S.C. § 542(a).  Next, Section 548(a)(1)(B) allows the Trustee to bring a cause of action to avoid fraudulent transfers that were made within two years of the filing of the bankruptcy petition.   11 U.S.C. § 548(a)(1)(B).   Third, Section 546 is the applicable statute of limitations provision.   Section 546(a)(1)(A) states that the Trustee must bring an action to avoid fraudulent transfers under Section 548 within two years of the petition date.  11 U.S.C. § 546(a)(1)(A).

The Trustee has also brought a cause of action to avoid fraudulent transfers pursuant to Texas state law.  The Trustee is permitted to do this under Section 544(b)(1), which provides that "the Trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is *voidable under applicable law*."  11 U.S.C. § 544(b)(1) (emphasis added).   The Texas state law avoidance and turnover statute is Section 24.008(a), which allows the Trustee to avoid fraudulent transfers.  Tex. Bus. & Com. Code Ann. § 24.008(a).  Section 24.006(a) is the substantive state law cause of action for fraudulent transfers, which provides that a claimant may avoid fraudulent transfers made within four years of the date the cause of action arose.    Tex. Bus. & Com. Code Ann. § 24.006(a); *see also* Tex. Bus. & Com. Code Ann. § 24.010(a)(2).

Because the Trustee has brought actions under both federal and state law, the Court will first conduct a preemption analysis to determine whether (a) the substantive fraudulent transfer

9

provision of 11 U.S.C. § 548(a)(1)(B) preempts the state law fraudulent transfer provision of § 24.006(a) of the Texas Business and Commerce Code; and (b) whether the federal statute of limitations for fraudulent transfer actions, contained in 11 U.S.C. § 546(a)(1), preempts the state law statute of limitations under § 24.010(a)(2) of the Texas Business and Commerce Code.

First, the Court finds that the Trustee may bring a cause of action for fraudulent transfers under either federal or state law, or both. *See In re Houston Drywall, Inc.*, No. 06-03415, 2008 WL 2754526, at *30-31 (S.D. Tex. July 10, 2008) (showing claimant could bring action under both 11 U.S.C. § 548 and § 24.005 of the TUFTA[4]); *In re Pioneer Homebuilders, Inc.*, 147 B.R. 889, 892-93 (Bankr. W.D. Tex. 1992) (showing that claimant could bring action under either 11 U.S.C. § 548 or § 24.006(a) of the TUFTA). Therefore, 11 U.S.C. § 548(a)(1)(B) does not preempt § 24.006(a) of the Texas Business and Commerce Code.

Next, the Court need not conduct a preemption analysis of the statute of limitations under either the state or federal cause of action, because the Trustee brought the action to avoid the transfers in a timely manner under both provisions. However, if the Court were to conduct a preemption analysis of the applicable statute of limitations, it would find that the Trustee must comply with both federal and state law. *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 675 (S.D. Tex. 2007) ("The trustee is subject to both federal bankruptcy-law limitations periods and the state-law limitations periods applicable to fraudulent-avoidance actions.").

The major preemption issue facing the Court is whether or not the federal look-back period for recovery of fraudulent transfers preempts the state look-back period. Although the elements of fraudulent transfers under state and federal law are substantially similar, *compare* 11

---

[4] The TUFTA is another name for certain sections of the Texas Business and Commerce Code that concern fraudulent transfers and the applicable rules of recovery.

10

U.S.C. § 548(a)(1)(B) *with* Tex. Bus. & Com. Code Ann. § 24.006(a), state law allows a four-year look-back period from the date of the complaint alleging fraudulent transfers, whereas federal law only allows a two-year look-back period from the date the bankruptcy petition was filed. *Compare* Tex. Bus. & Com. Code Ann. § 24.010(a)(2) *with* 11 U.S.C. § 546(a)(1)(A). Before this Court analyzes whether the transfers at issue are fraudulent transfers under either state or federal law, the Court must first determine whether the federal look-back period for a fraudulent transfer claim preempts the state look-back period. For the reasons set forth below, the Court concludes that it does not.

"Federal preemption analysis begins with 'the basic assumption that Congress did not intend to displace state law.'" *Smith v. Am. Founders Fin., Corp.*, 365 B.R. at 676 (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). Federal law may preempt state law in three situations:

> First, when acting within constitutional limits, Congress is empowered to preempt state law by so stating in express terms. Second, congressional intent to preempt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation . . . . As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280-81 (1987) (citations omitted).

Section 548(a)(1)(B)—which gives allows the Trustee to avoid fraudulent transfers made within two years of the date the petition was filed—does not expressly preempt state law. Nor is § 548(a)(1)(B) so comprehensive that this Court may draw an inference that Congress intended

11

to leave no room for state regulation. Therefore, the Court must analyze the third type of preemption—conflict preemption. Here, there is no conflict of law, as the Trustee may properly comply with both the state and federal look-back provisions. As such, § 548(a)(1)(B) does not preclude the Trustee from recovering under §§ 24.008(a) and 24.010(a)(2) of the Texas Business and Commerce Code in this case.

Further, pursuant to the strong-arm provision of 11 U.S.C. § 544(b), fraudulent conveyance claims refer to applicable *state* law. *Rodney D. Tow v. Schumann Rafizadeh (In re Cyrus II P'ship)*, No. 07-03301, 2008 WL 5479108, at *4 (Bankr. S.D. Tex. 2008) ("These claims are unique because they exist only to the extent of applicable state law."); *see also* 11 U.S.C. § 544(b). Therefore, this Court may properly apply the four-year look-back period permitted by Texas law. *See* Tex. Bus. & Com. Code Ann. § 24.010(a)(2).

In sum, if the Trustee can successfully prove his claims for fraudulent transfer under applicable Texas law, this Court will apply the corresponding state law four-year look-back period.

## C.    Fraudulent Transfers Under the Bankruptcy Code: § 548(a)(1)(B)

The Trustee argues that the Debtor should be able to avoid the Payments made to Option One during the two-year period before the petition was filed, totaling $48,000.08, as fraudulent transfers under 11 U.S.C. § 548(a)(1)(B).[5] Specifically, the Trustee argues that the Payments from the Amegy Account constituted the Debtor's property and that the Debtor received less than a reasonably equivalent value in exchange for the transfers. *See* 11 U.S.C. § 548(a)(1)(B).

---

[5] The Trustee also pleaded under § 548(a)(1)(A) but did not argue this issue during closing arguments. The Court therefore presumes that the Trustee no longer seeks to recover under § 548(a)(1)(A). However, even if the Trustee does intend to recover pursuant to § 548(a)(1)(A), he cannot do so because he introduced no evidence at trial to establish that the Debtor—through Ortega or anyone else—made the transfers at issue "with actual intent to hinder, delay, or defraud" an entity to which the Debtor is indebted.

12

The Defendant, however, argues that the Trustee failed to meet his burden of proof with regard to these elements.  The Court disagrees and concludes that the Trustee has established that the Debtor is entitled to avoid these transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

To prevail on a claim for fraudulent transfer under § 548(a)(1)(B), the Trustee must demonstrate: (1) a transfer was made of the Debtor's property; (2) the transfer was made within two years of the petition date; (3) the Debtor received less than reasonably equivalent value in exchange for such transfer; and (4) the Debtor was insolvent at the time of such transfer.  11 U.S.C. § 548(a)(1)(B).

The first issue is whether or not the Amegy Account is the Debtor's property.  Although the Amegy Account is entitled "Marcella Ortega dba Young Again Nutrients," [Finding of Fact No. 3], the Trustee credibly testified that all money flowing into this account came solely from the business activities of the Debtor.  [Finding of Fact No. 4.]  The Court is further convinced of this fact because Ortega, the president of the Debtor, and one of her sons, John Acord, went to the Trustee's office after his appointment and turned over to him the Amegy Account, representing to him that the Amegy Account was the Debtor's account.  [Finding of Fact No. 4.]  Additionally, the Amegy Account is listed as an asset of the Debtor in the Debtor's schedules, which were signed under penalty of perjury by Ortega herself.  [Finding of Fact No. 4.]  In his closing argument, Defendant's counsel argued that Ortega was confused and, while believing that the Amegy Account was hers, still turned it over to the Trustee because she thought she had an obligation to do so.  Notably, Option One introduced not one shred of evidence upon which to base this argument.  Moreover, the Court does not find Option One's argument plausible, as it is highly unlikely that Ortega would have voluntarily turned over funds to the Trustee which she

13

honestly believed belonged to her. The Court therefore concludes that the Amegy Account is the Debtor's property, thereby satisfying the first element of § 548(a)(1)(B).

The second issue is whether the transfers were made within two years of the petition date. The Debtor filed its Chapter 11 petition on November 3, 2006. [Finding of Fact No. 19.] As such, the Trustee may recover any Payments made to Option One between November 3, 2004 and November 3, 2006. Thus, the Trustee may recover approximately $48,000.08 from Option One pursuant to 11 U.S.C. § 548(a)(1)(B). *See* [Finding of Fact No. 8.]

The third issue is whether or not the Debtor received a benefit from the Payments made to Option One and whether that benefit constitutes "reasonably equivalent value" to the Debtor. The Trustee argues that no such benefit was received by the Debtor, thereby satisfying the third element of Section 548. *See* 11 U.S.C. § 548(a)(1)(B)(i). This Court agrees. The Debtor never operated its business out of the properties whose loan balances were reduced by the Payments during the time the Payments were made to Option One. [Finding of Fact No. 16.] Rather, the only beneficiaries of these Payments were Ortega and Sean Ortega, in their personal capacities. [Finding of Fact No. 8.] This finding is supported by the fact that although Ortega claimed the Deer Lodge Property as the Debtor's principal place of business from 2002 to 2004, she leased the Deer Lodge Property to a third party, John Livingston, from October 10, 2003 to October 31, 2004. [Finding of Fact No. 11.] Additionally, she claimed the Deer Lodge Property as her homestead from 2004 to 2006. [Finding of Fact No. 12.] Despite the fact that Ortega designated the Cattle Drive Property as the Debtor's principal place of business from 2004 to 2006, [Finding of Fact No. 13], on November 23, 2004, she claimed the Cattle Drive Property as her primary residence, [Finding of Fact No. 14], and she currently resides at that property. [Finding of Fact

14

No. 15.] Taking these facts together, the Court concludes that at no time did the Debtor conduct its business at either of these two locations, but rather these properties were used solely to benefit Ortega and Sean Ortega individually. [Finding of Fact Nos. 8 & 16.] The Debtor did not receive any benefit whatsoever from the Payments made to Option One. [Finding of Fact No. 16.]

The fourth issue is whether or not the Debtor was insolvent at the time the Payments were made to Option One. The Court concludes that it was. The Court bases this conclusion on Smith's uncontroverted and very credible testimony that the Debtor was insolvent as of June 30, 2003 because of two lawsuits filed by YAP against the Debtor alleging breach of contract and trademark infringement/unfair competition. [Finding of Fact Nos. 17 & 18.] In his expert report, Smith estimated the Debtor would owe YAP $1.5 million due to these lawsuits. [Finding of Fact No. 17.] Smith arrived at this figure after reviewing a detailed financial analysis submitted along with the proof of claim and after considering extensive settlement negotiations between the Trustee and YAP. Given this estimation, Smith concluded that as of June 30, 2003, the Debtor had liabilities in excess of assets in the amount of $1,160,206.00. [Finding of Fact No. 18.] Smith specifically attributes the $1.5 liability to the Debtor's insolvency. [Finding of Fact No. 18.] All in all, when the first known Payment was made to Option One on August 14, 2003, the Debtor was insolvent. [Finding of Fact Nos. 8 & 18.]

In sum, the Trustee has satisfied all four elements required to prove a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B). Therefore, the Court concludes that the Trustee is entitled to a turnover from the Defendant of $48,000.08 pursuant to 11 U.S.C. § 542(a).

**D.    Fraudulent Transfers Pursuant to Texas Law: Tex. Bus. & Com. Code Ann. §
      24.006(a)**

The Trustee also argues that the transfers made to Option One constitute fraudulent

transfers under Texas law, pursuant to § 24.006(a) of the Texas Business and Commerce Code.

To prevail on a claim for fraudulent transfer under § 24.006(a), the Trustee must demonstrate:

(1) the Payments were made without the Debtor receiving a reasonably equivalent value in

exchange for the Payments; (2) the Debtor was insolvent at the time of the Payments; (3) a

creditor exists whose claim arose before the occurrence of the transfers for whom the Trustee can

act; and (4) the cause of action arose within four years after the transfers were made.  Tex. Bus.

& Com. Code Ann. §§ 24.006(a) & 24.010(a)(2).  The Trustee has brought a claim under Texas

law in addition to 11 U.S.C. § 548(a)(1)(B) because if the Trustee prevails on his cause of action

under § 24.006(a) of the Texas Business and Commerce Code, he will be entitled to recover

transfers made to Option One within four years of the date the cause of action accrued, rather

than the two years permitted by § 548.  *See* Tex. Bus. & Com. Code Ann. § 24.010(a)(2).  The

Defendant argues that the Trustee has failed to meet his burden of proof for his state law claim.

The Court disagrees.

The first two elements of § 24.006(a)—which are nearly identical to two of the three

elements of § 548(a)(1)(B)—have previously been discussed and are satisfied.  *See supra* Part

IV.C.  Therefore, the first issue unique to the Texas statute is whether a creditor exists whose

claim arose before the occurrence of the transfers for whom the Trustee can act.  The Court finds

that such a creditor did exist.  YAP was a creditor of the Debtor at least as early as June 30,

2003. [Finding of Fact No. 17.]  The Court makes this conclusion because YAP filed a proof of

claim against the Debtor for approximately $1.5 million for damages accrued between July 2003

and 2006, which is presumed valid. [Finding of Fact No. 17.] Therefore, there was an existing creditor on August 14, 2003, before the first Payment was made to Option One.

The second issue unique to the Texas statute is whether the Payments were made within the applicable statute of limitations. Section 24.010 stipulates that a cause of action with respect to a fraudulent transfer is extinguished unless action is brought within four years after the transfer was made. Tex. Bus. & Com. Code Ann. § 24.010(a)(2). "The drafters of the original UFTA intended that the extinguishment provision be enforced as a statute of repose rather than as a traditional waiveable statute of limitations." *Duran v. Henderson*, 71 S.W.3d 833, 838 (Tex. App.—Texarkana 2002, no pet.) "The provision abolishes the right to bring a fraudulent transfer action if the action is not brought within the established time limits." *Id.* In this suit, the Trustee filed the complaint alleging fraudulent transfers on July 30, 2008. [Adv. Docket No. 1.] Therefore, the Trustee may recover any Payments made within four years of this date.[6] Approximately $63,582.20 was transferred to Option One between July 30, 2004 and July 30, 2008. *See* [Finding of Fact No. 8.]

Therefore, pursuant to §§ 24.006(a) and 24.010(a)(2) of the Texas Business and Commerce Code, the transfers totaling $63,582.20 made to Option One within four years of the cause of action are fraudulent transfers.

---

[6] In the Trustee's Proposed Conclusions of Law, he argued that, under Texas law, recovery of fraudulent transfers is permitted so long as the claim is made within four years of the date of the filing of the bankruptcy petition. [Adv. Docket No. 26-1.] However, the Trustee is mistaken. The wording of the Texas statute makes it clear that recovery of fraudulent transfers is permitted so long as "*a cause of action with respect to a fraudulent transfer or obligation . . . is brought within four years after the transfer was made or the obligation was incurred.*" Tex. Com. & Bus. Code Ann. § 24.010 (emphasis added). Therefore, this Court looks back four years from July 30, 2008, the date the complaint alleging fraudulent transfers was filed.

E.   **Recovery of Payments by Trustee Pursuant to § 24.008(a)(2) of the Texas Business and Commerce Code**

Because $63,582.20 in payments made to Option One between July 30, 2004 and July 30, 2008 are fraudulent transfers, the Defendant must turn over these payments to the Trustee pursuant to § 24.008(a)(2) of the Texas Business and Commerce Code. In Texas, a claimant has a four year window to file a fraudulent transfer claim. *See* Tex. Bus. & Com. Code Ann. § 24.010(a)(2). Specifically, Section 24.010 reads: "[A] cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought under 24.006(a) within four years after the transfer was made or the obligation was incurred." *Id.*

Many courts in this District and Texas state courts have held that Section 24.010 acts as a statute of repose, rather than a statute of limitations. *See GMAC Mortgage LLC v. Blitz Holdings Corp. (In re IFS Fin. Corp.)*, No. 08-03047, 2008 WL 4533713, at *2 (Bankr. S.D. Tex. 2008); *see also Cadle Co. v. Wilson*, 136 S.W.3d 345, 350 (Tex. App.—Austin 2004, no pet.); *Duran v. Henderson*, 71 S.W.3d 833, 838 (Tex. App.—Texarkana 2002, no pet.). This Court agrees. Because Section 24.010 operates as a statute of repose, it extinguishes a fraudulent transfer cause of action that is not brought within four years of the transfer. *In re IFS Fin. Corp.*, 2008 WL 4533713, at *2.

Because the Trustee filed his complaint against Option One alleging fraudulent transfers on July 30, 2008, the Court may look back four years from this date. Therefore, the Trustee may recover $63,582.20. *See* [Finding of Fact No. 8.] This amount represents the portion of Payments paid to Option One between July 30, 2004 and July 30, 2008. *See* [Finding of Fact No. 8.] As such, pursuant to the Texas Business and Commerce Code §§ 24.008 and 24.010, the Court may order Option One to turn over $63,582.20 to the Trustee.

18

Alternatively, the Trustee is entitled to recover Payments made to Option One under federal law. Section 542 of the Code provides that the Trustee may recover, for the benefit of the estate, any property fraudulently transferred under Section 548 from the initial transferee of such transfer or the entity for whose benefit such transfer was made. 11 U.S.C. § 542(a). As the Payments were made to benefit to initial transferee, Option One, Option One must return these Payments to the Trustee. However, because 11 U.S.C. § 548(a)(1)(B) applies only to transfers made within two years of the bankruptcy petition, which was filed on November 3, 2006, the Trustee may only recover any Payments made between November 3, 2004 and November 3, 2006, or approximately $48,000.08, from Option One for the benefit of the estate. *See* [Finding of Fact Nos. 8 & 19.]

As discussed above, § 546(a)—the applicable statute of limitations for fraudulent transfer actions brought pursuant to § 548—is specifically designed to give the trustee "breathing room" to determine which claims to bring under § 544 and to provide reprieve from more restrictive state statutes of limitations. *See supra* Part IV.B. Therefore, because, in this lawsuit, § 24.010(a)(2) of the Texas Business and Commerce Code provides a longer look-back period than § 546(a) of the Bankruptcy Code, the Court will apply Texas state law and order turnover of $63,582.20, pursuant to the Texas Business and Commerce Code §§ 24.008 and 24.010, rather than $48,000.08, as permitted under federal law. As stated earlier, given the strong-arm provisions of 11 U.S.C. § 544(b), the Court may properly apply state law instead of federal law for fraudulent transfer claims.

**F.      Constructive Trust Theory of Recovery**

As an alternative argument, the Trustee also seeks to recover the Payments under an equitable constructive trust theory of recovery.   [Adv. Docket No. 1, ¶ 16.]   This Court concludes, however, that the Trustee has failed to meet the elements of a constructive trust, and therefore declines to award recovery under this theory.

The term 'constructive trust' is broadly defined as a trust arising by operation of law, as distinguished from an express trust; but in a more restricted sense—and as distinguished from a resulting trust—it is defined as a trust not created either expressly or impliedly based on a direct intention to create a trust, but as a matter of equity in order to satisfy the demands of justice. *Consol. Gas & Equip. Co. of Am. v. Thompson*, 397 S.W.2d 260, 263 (Tex. Civ. App.—Amarillo 1965), *rev'd on other grounds*, 405 S.W.2d 333 (Tex. 1966).  Equity will impose a constructive trust to prevent one who obtained property by fraudulent means from being unjustly enriched. *Id.*

Texas law recognizes three elements of a constructive trust: (1) breach of a fiduciary duty or, in the alternative, actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing of the property to an identifiable *res*.  *In re Haber Oil Co., Inc.*, 12 F.3d 426, 437 (5th Cir. 1994).  The Court will begin its analysis by looking for either a breach of fiduciary duty, or, in the alternative, evidence of actual fraud.

**1.      Breach of Fiduciary Duty**

The first issue is whether there was either a breach of fiduciary duty.  This Court finds there was a breach of fiduciary duty owed by Ortega to the creditors of the Debtor.

As a general rule, "Texas courts have held that the obligation between a borrower and a lender is not a fiduciary one." *Williams v. Countrywide Home Loans, Inc.*, 504 F. Supp. 2d 176, 192 (S.D. Tex. 2007). Therefore, at first glance, it would appear that Ortega, as president of the Debtor, owes no duty to her creditors. However, under Texas law, corporate officers, such as Ortega, have fiduciary duties to creditors when the corporation is insolvent. *See e.g., Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1269 ("Becoming insolvent, the equitable interest of the stockholders in the property, together with their conditional liability to the creditors, places the property in a condition of trust, first, for the creditors, and then for the stockholders." (quoting *Hollins v. Brierfield Coal & Iron Co.*, 150 U.S. 371, 383 (1893)) (internal quotation marks omitted) (emphasis omitted)); *Jewel Recovery, L.P. v. Gordon*, 196 B.R. 348, 354 (N.D. Tex. 1996) ("[W]hen a corporation becomes insolvent, the assets of the corporation become a trust for the benefit of the corporation's creditors.").

Altogether, Ortega, as president of the Debtor, had a fiduciary relationship with the Debtor's creditors, since the Debtor was insolvent at the time of the Payments. [Finding of Fact Nos. 8 & 18.] Nevertheless, "[t]he elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the *plaintiff* and *defendant*; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Jones v. Blume,* 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied) (emphasis added). In this suit, the plaintiff is the Trustee, not the creditors, and the defendant is Option One, not Ortega.

The fact that the plaintiff in this case is the Trustee, and not the creditors, is of no consequence. Pursuant to 11 U.S.C. § 544(b), the Trustee may stand in the shoes of the

creditors, acting as the plaintiff in this case, and assert a claim for breach of fiduciary duty. *See In re Brentwood Lexford Partners, LLC*, 292 at 272; *see also* 11 U.S.C. § 544. As such, the Trustee has standing in this suit to bring a claim of breach of fiduciary duty for the benefit of the creditors.

However, this Court encounters a problem regarding the defendant named in the case, since the Trustee sued only Option One, and not Ortega. The Trustee may sue the transferee of fraudulent transfers for breach of fiduciary duty, only when the transferee knew the transferor was breaching a fiduciary duty. *See ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 411-12 (S.D. Tex. 2009) (holding that the defendant transferee may be sued for breach of fiduciary duty when it accepted a fraudulent stock transfer, knowing that the transfer would breach the fiduciary duty the transferor owed its creditors). Here, there is no evidence that Option One knew Ortega was breaching a fiduciary duty to the Debtor's creditors when she made the Payments to Option One. All in all, because the Trustee chose not to sue Ortega, but rather to sue Option One, the Trustee may not pursue a claim for breach of fiduciary duty.

Because the Court concludes that Option One could not possibly breach any fiduciary duty to the Trustee, the Court must find evidence of actual fraud in order to continue with the constructive trust theory.

## 2. Actual Fraud

"Actual fraud means actual intent to defeat or delay the rights of creditors." *Ala. Credit Corp. v. Deas*, 417 F.2d 135, 139 (5th Cir. 1969). There is no evidence that Ortega intended to defeat or delay the rights of creditors. However, actual fraud may also be proven by circumstantial evidence. *In re Brentwood Lexford Partners, LLC*, 292 B.R. at 263-64. Texas

courts will often look to the "badges of fraud" listed in the Texas Business and Commerce Code § 24.005(b) for guidance. These badges of fraud include whether: "(1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." Tex. Bus. & Com. Code Ann. § 24.005(b).

Although the Trustee has shown that the Debtor was insolvent at the time of the fraudulent transfers [Finding of Fact No. 18], this is the only badge shown, and this Court concludes that this is insufficient to find actual fraud. *See Diamant v. Sheldon L. Pollack Corp.*, 216 B.R. 589, 591 (Bankr. S.D. Tex. 1995) (holding that one badge of fraud, standing alone, is insufficient to support a finding of actual fraud); *see also In re Northgate Computer Sys., Inc.*, 240 B.R. 328, 364 (Bankr. D. Minn. 1999) (holding that a finding of the debtor's insolvency at the time of the transfers alone is insufficient to conclude actual fraud). Additionally, this Court refuses to stretch Ortega's negative inference obtained under the "uncalled witness rule" (discussed *infra* Part IV.G.2) so far that it would support a finding of actual fraud. Altogether,

because the Court concludes that there was no breach of fiduciary duty and there was no actual fraud, recovery under the constructive trust theory fails.

## G.    Evidentiary Issues

### 1.    The Shifting Burden of Proof

In his closing argument, Counsel for the Defendant argued that the Trustee had failed to meet his burden in proving that the Amegy Account was property of the Debtor.   While this Court agrees with counsel on his legal assessment of the burden of proof, it disagrees with his conclusion.

This Court notes that the Trustee carries an "initial burden of proving that the property at issue is property of the estate." *In re Heritage Org., LLC*, 350 B.R. 733, 738 (Bankr. N.D. Tex. 2006).  However, once this burden has been met, the burden then shifts to the Defendant to prove that, for whatever reason, the property was not part of the Debtor's estate. *See In re Southmark*, 49 F.3d 1111, 1118 (5th Cir. 1995) (shifting the burden to the defendant to prove the "existence of a constructive trust"); *Daly v. Radulesco (In re Carrozzella & Richardson)*, 247 B.R. 595, 602 (B.A.P. 2d Cir. 2000) (shifting the burden to the defendant to prove "only legal title" to the money, rather than control).

At trial, the Trustee adduced abundant testimony and introduced certain exhibits that the Amegy Account constitutes property of the Debtor.  For example, credible testimony was given by both the Trustee and Smith that all money flowing into the Amegy Account came from the Debtor's business activities.  [Finding of Fact No. 4.]  Furthermore, Ortega and Acord turned over the Amegy Account to the Trustee upon his appointment, representing the account as property of the Debtor.  [Finding of Fact No. 4.]  Additionally, the Amegy Account was listed as

24

an asset in the Debtor's schedules and was signed by Ortega. [Finding of Fact No. 4.] Thus, the Trustee has met his initial burden of proving that the Amegy Account is property of the Debtor, and the burden shifted back to the Defendant to prove otherwise. The Defendant, however, introduced no testimony or exhibits to rebut this point. Accordingly, the Court concludes that the Trustee met his burden to establish that the Amegy Account is property of the Debtor.

## 2.    The "Uncalled Witness Rule"

The "uncalled witness rule" permits an inference that the testimony of a witness available to a party, but who is not called by that party, would be unfavorable to the party's case. *Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1046 (5th Cir. 1990). The Fifth Circuit has noted that this rule should be disfavored in cases "conducted under the Federal Rules of Evidence and the Federal Rules of Civil Procedure," but has not yet foreclosed its use to the courts of the Fifth Circuit. *Id.* at 1047-49. Indeed, both the Fifth Circuit and district courts have acknowledged that the rule is still viable. *See King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003); *United States v. Reyna*, 148 F.3d 540, 546 (5th Cir. 1998); *Rivera v. Salazar*, No. C-04-552, 2008 U.S. Dist. LEXIS 58065, at *10 (S.D. Tex. July 30, 2008); *Hull v. Ford*, No. C-05-43, 2008 U.S. Dist. LEXIS 3686, at *4-5 (S.D. Tex. Jan. 17, 2008).

The Fifth Circuit has also specified that the "uncalled witness rule" may be used only when the witness has information "peculiarly within his knowledge" rather than merely "cumulative" testimony. *Streber v. C.I.R.*, 138 F.3d 216, 221-22 (5th Cir. 1998). In addition, while the rule is unavailable when a party is "'equally available' to both parties," when the witness is "connected in some way to one of the parties," and when that witness "'would corroborate' that party's theory of the case," then the witness is not "equally available." *U.S. v.*

25

*Wilson,* 322 F.3d 353, 364 n.14 (5th Cir. 2003) (quoting *McClanahan v. United States,* 230 F.2d 919, 925 (5th Cir. 1956)).

In the suit at bar, Ortega has information "peculiarly" within her knowledge. Her testimony as to whether the Amegy Account was her personal account or the property of the Debtor would help resolve the fraudulent transfer issue. The Trustee testified that Ortega turned the Amegy Account over to him, representing that it was property of the Debtor. [Finding of Fact No. 4.] Ortega's testimony on this matter would very likely support this testimony, which is presumably why the Defendant refused to call Ortega as a witness. Therefore, this Court finds that the "uncalled witness rule" applies in this case, and the rule allows the Court to draw an inference that Ortega's testimony would be unfavorable to the Defendant because the Defendant chose not to call her to the stand. The Defendant could have easily called on Ortega to testify that the funds in the Amegy Account belonged to her, personally, and not to the Debtor—which is the very argument that the Defendant's counsel made in closing. Yet, the Defendant did not put Ortega on the stand. It could have easily done so because she resides in Magnolia, Texas— which is approximately thirty miles from the Courthouse—and could have been subpoenaed without any problem. The fact that the Defendant failed to call Ortega allows this Court to draw the inference that the Amegy Account was indeed property of the Debtor.

## H.   Piercing the Individual Veil

In the alternative, even if this Court does not draw an inference under the "uncalled witness rule," the Amegy Account is still properly considered property of the Debtor. This conclusion is supported by an independent analysis of the purpose of, and the funds within, the

26

Amegy Account.  In other words, the Court must pierce the "individual veil,"[7] and view the Amegy Account as property of the Debtor, despite the account being named "Marcella Ortega dba Young Again Nutrients."

First, while courts generally protect individual assets from the reach of a corporation's bankruptcy case, "[w]hen corporate and individual business interests are so intertwined that the corporation is indistinguishable from the individual, the alter ego doctrine operates to treat the assets of both as corporate property." *In re Gordon Car & Truck Rental, Inc.*, 65 B.R. 371, 377 (Bankr. N.D.N.Y. 1986) (quoting *In re Telemark Mgmt. Co.*, 43 B.R. 579, 586 (Bankr. W.D. Wis. 1984)).

Second, an individual's bank account may also be considered part of a debtor's estate under the alter ego doctrine.  In *Gibraltar Sav. v. LDBrinkman Corp.*, the Fifth Circuit described the rationale behind the doctrine stating, "'if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors.'" 860 F.2d 1275, 1288 (5th Cir. 1988) (quoting *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)).  The test for determining whether an individual is the "alter ego" of a corporate debtor is whether a "unity of interest and ownership" exists such that the "corporation and the individual no longer exist," and also that "fraud or injustice" would result if the corporate form is observed.  *In re Major Funding Corp.*, 126 B.R. 504, 510-11 (Bankr. S.D. Tex. 1990).

---

[7] A court may—in some instances—"pierce the corporate veil" to determine whether the activities and property of a corporation should be attributed to its individual principal or principals.  In this case, the Court is being asked to do the opposite, that is, to "pierce the individual veil" and attribute property held by an individual—Ortega—to the Debtor.

Finally, when accounts have been misused and the distinction between individual and corporation has been blurred, courts are usually willing to include the accounts of another entity in a bankruptcy case. In *Pergament v. Precision Sounds DJ's, Inc.* (*In re Oko*), the court found that a principal of a company used that company's account as his "own private checking account" and paid his own and other's debts out of it. 395 B.R. 559, 564 (Bankr. E.D.N.Y. 2008). Because of these circumstances, the "corporate veil [was] pierced." *Id.*

In the suit at bar, since the Amegy Account was funded exclusively by the Debtor's business [Finding of Fact No. 4], and yet was used exclusively to pay the personal expenses of Ortega [Finding of Fact No. 8], the Debtor's president, the Court concludes that the corporate and the individual interests have been "so intertwined" that they are indistinguishable. Because Ortega completely disregarded the separation between the Debtor's and her individual funds, this Court will do the same and will conclude the Amegy Account is property of the Debtor. Additionally, because the fraudulent transfers from the Amegy Account, if not avoided, would seriously hinder the Trustee's ability to administer this bankruptcy case, great "fraud or injustice" would result if the Amegy Account is not determined to be property of the Debtor.

"The laws and jurisprudence of bankruptcy note often that there are two competing goals of bankruptcy and reorganization. One is the satisfaction of valid claims against the estate. The other is to allow the debtor a 'fresh start' in the market place." *In re T-H New Orleans Ltd. P'ship*, 188 B.R. 799, 807 (E.D. La. 1995), *aff'd*, 116 F.3d 790 (5th Cir. 1997). Because Option One was never a creditor of the Debtor's estate [Finding of Fact No. 9], and because inclusion of the Amegy Account would help satisfy the valid claims against the estate, this inclusion would only further the goals of bankruptcy law.

28

In sum, this Court finds that if the Amegy Account is excluded from the Debtor's estate, then "an injustice would be visited upon the Debtor's creditors and would only subserve the interest of a debtor who has previously violated an order of this Court." *In re Mansuy*, 94 B.R. 443, 445 (Bankr. N.D. Ohio 1988). Therefore, no other option remains but to include the Amegy Account as part of the Debtor's property.

## I.    Pre- and Post-Judgment Interest

### 1.    Interest Under Federal Law

Under federal law, this Court is authorized to award pre-judgment interest. The Fifth Circuit has held that such interest may be awarded in cases involving fraudulent transfers because it "furthers the congressional policies of the Bankruptcy Code" and "compensates the estate for the time it was without use of the transferred funds." *In re Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1339-40 (5th Cir. 1995).   This Court also has the discretion to impose post-judgment interest. *See Williams v. Trader Pub. Co.*, 218 F.3d 481, 488 (5th Cir. 2000) (holding that, "[a] district court has discretion to impose a pre and post-judgment interest award to make a plaintiff whole"); 28 U.S.C. § 1961(a) (allowing interest on "any money judgment in a civil case recovered in a district court" at the rate of the "weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment"); *Ocasek v. Manville Corp. Asbestos Disease Compensation Fund*, 956 F.2d 152, 154 (7th Cir. 1992) (holding that the federal post-judgment interest statute "applies to judgments entered by bankruptcy court").

Because no federal statute sets the pre-judgment interest rate, the Court must look to state law. *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 164 (S.D. Tex. 2009) (holding that

for "fraudulent-transfer actions . . . courts may look to the laws of the state under which a similar fraudulent-transfer action could have been brought for such guidance"); *see also In re Zohdi*, 234 B.R. 371, 385 (Bankr. M.D. La. 1999) (holding that the court should look to state law for the pre-judgment interest rate). Under Texas law, the rate of pre-judgment interest "accrue[s] at the same rate as post-judgment interest." *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002); *see also Bob Anderson v. Mega Lift Sys., L.L.C. (In re Mega Sys., L.L.C.)*, No. 04-6085, 2007 WL 1643182, at *10-11 (Bankr. E.D. Tex. 2007). The post-judgment rate is statutorily set at the "prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation" unless this rate is less than five percent or more than fifteen percent. Tex. Fin. Code Ann. § 304.003(c). Therefore, this Court will follow the Texas method of calculating interest and use the prime rate, as opposed to the Treasury yield.

**2.    Interest Under Texas Law**

Under state law, pre-judgment interest may be awarded if either the "general principles of equity" or an "enabling statute" permit such an award. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998) (citing *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985); and *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480, 483-85 (Tex. 1978)). Texas courts have held that "the decision to award prejudgment interest is left to the sound discretion of the trial court, which should rely upon equitable principles and public policy in making this decision." *Citizens Nat. Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 487 (Tex. App.—Fort Worth 2004, no pet.). Texas courts have concluded that equity allows for such an award, and thus have frequently awarded pre-judgment

interest in fraudulent transfer cases. *See, e.g., Lentino v. Cullen Center Bank & Trust*, No. 14-00-00692-CV, 2002 WL 220421, at *1 (Tex. App.—Houston [14th Dist.] Feb. 14, 2003, pet. denied) (mem. op.); *McDill Columbus Corp. v. Univ. Woods Apartments, Inc.*, No. 06-99-00138-CV, 2001 WL 392061, at *3 (Tex. App.—Texarkana Apr. 19, 2001, pet. denied) (unpublished); *Arlitt v. Weston*, No. 04-98-00035-CV, 1999 WL 1097101, at *2 (Tex. App.— San Antonio Dec. 1, 1999, pet. denied).[8]  Post-judgment interest may also be awarded on a fraudulent transfer claim under Texas law. *Fidelity & Deposit Co. of Maryland v. Tri-Lam Co., Inc.*, No. SA-06-CA-207-XR, 2007 WL 1452632, at *5 (W.D. Tex. May 15, 2007) (citing Tex. Fin. Code Ann. § 304.001).

As discussed earlier, the rate for both pre-judgment and post-judgment interest under Texas law is the prime rate as published by the Board of Governors of the Federal Reserve

---

[8] The Court notes that Texas courts are split over whether pre-judgment interest should be granted in every case or at the trial court's discretion. One Texas Court of Appeals has stated:

> There is a split of authority among Texas Courts of Appeals . . . concerning whether an award of pre-judgment interest is mandatory. Some courts . . . have held that pre-judgment interest should be awarded as a matter of course. *See Apache Corp. v. Dynegy Midstream Servs., Ltd. P'ship*, 214 S.W.3d 554, 566 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (stating a prevailing party is awarded pre-judgment interest as a matter of course); *Baker Hughes Oilfield Operations, Inc. v. Hennig Prod. Co.*, 164 S.W.3d 438, 447 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding same). However, the majority of courts . . . have held that awards of pre-judgment interest are within the trial court's discretion. *See, e.g., Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 487 (Tex. App.—Fort Worth 2004, no pet.) (stating, in a review of the trial court's interest calculations, that where no statute controls the award of pre-judgment interest, the decision to award pre-judgment interest is left to the sound discretion of the trial court); *Marsh v. Marsh*, 949 S.W.2d 734, 744 (Tex. App.—Houston [14th Dist.] 1997, no writ) (applying, in a review of trial court's pre-judgment interest calculations, abuse of discretion standard); *Larcon Petroleum, Inc. v. Autotronic Sys., Inc.*, 576 S.W.2d 873, 879 (Tex. Civ. App.—Houston [14th Dist.] 1979, no writ) (stating, in a review of the trial court's interest calculation, that a trial court is permitted, but not required, to award pre-judgment interest under the authority of a statute, or under an equitable theory, or under both).

*SAP Trading Inc. v. Sohani*, 2007 WL 1599719, at *2 n.5 (Tex. App.—Houston [14th Dist.] June 5, 2007, no pet.) (omission added). However, this Court finds that pre-judgment interest is appropriate in the suit at bar, and, therefore, this split is of no consequence.

System. Tex. Fin. Code Ann. § 304.003(c). However, § 304.003(c)(2) of the Texas Finance Code Annotated states that the judgment rate shall be set at 5% if the current prime rate is less than 5%. The current prime rate is 3.25%. Federal Reserve Statistical Release, H.15 Selected Interest Rates, http://www.federalreserve.gov/releases/h15/current/h15.htm (last visited June 22, 2009). Therefore, pursuant to § 304.003(c)(2) of the Texas Finance Code Annotated, the Court will apply a 5% interest rate to both pre- and post-judgment awards. *See Int'l Turbine Servs., Inc.*, 278 F.3d at 500 (holding that the rate of pre-judgment interest accrues at the same rate as post-judgment interest); *see also In re Mega Sys., L.L.C.*, No. 04-6085, 2007 WL 1643182, at *10-11 (holding same).

### 3.  Accrual of Interest

This Court's award of pre-judgment interest will accrue from the "time demand is made or an adversary proceeding is instituted." *Floyd v. Dunson (In re Rodriguez)*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997). This Court's award of post-judgment interest will accrue during the period beginning on the date the judgment is rendered and ending on the date the judgment is satisfied, except for any time a motion for extension of time to file a brief, in case of appeal. Tex. Fin. Code Ann. § 304.005.

In conclusion, this Court awards the Trustee pre- and post-judgment interest at the rate of 5% on all money damages awarded hereunder from the date the complaint alleging fraudulent transfers was filed, July 30, 2008, until the date the judgment is satisfied. Because the Court does not know when the judgment will be satisfied, the Court presently awards pre-judgment interest from the date of the complaint until the date judgment is rendered in the amount of $2,978.78. The Trustee, however, is also entitled to post-judgment interest on the sum of the

principal plus pre-judgment interest at the rate of 5% per annum from the date the judgment is rendered until the date the judgment is satisfied.

**J.   Attorneys' Fees**

The Court awards the Trustee his reasonable fees and costs pursuant to the Texas Business and Commerce Code § 24.013, in an amount to be determined at a separate hearing if, and only if, Counsel for the Trustee and Counsel for Option One are unable to agree on a specific number.   Accordingly, Counsel for the Trustee is directed to send his invoices to Counsel for Option One within seven days of the date that this Memorandum Opinion is entered on the docket.   Counsel for Option One is directed to review these invoices and file a certificate with the Clerk of Court, by no later than July 31, 2009, setting forth that Option One agrees to the fees and expenses requested by Counsel for the Trustee or, if Option One does not agree, setting forth why.   If the certificate represents that Option One agrees, then the Court will sign a separate order awarding the amount agreed upon.   If, however, the certificate represents that Option One does not agree, then this Court will schedule a separate hearing, and each party will be allowed to introduce evidence and make arguments as to what the amount should be.

Additionally, the Court orders Option One to pay the Trustee post-judgment interest, at a rate of 5% per annum, on the total amount of attorneys' fees ultimately awarded for services which Counsel for the Trustee rendered.   The Fifth Circuit has held that interest on attorneys' fees begins to accrue on the date of the judgment allowing recovery of attorneys' fees and runs until the date the fees are paid in full.   *See Copper Liquor, Inc. v. Adolph Coors Co.*, 741 F.2d 542, 544-45 (5th Cir. 1983) (en banc), *overruled in part on other grounds by J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193, 1195 (5th Cir.1985), *aff'd.* 482 U.S. 437 (1987) (holding

that the victor is entitled to interest on attorneys' fees, at the same interest rate as that applied to the judgment on the merits).  The Fifth Circuit allows this interest on attorneys' fees because it "better serve[s] the purpose of awarding these expenses to the prevailing party since it . . . more nearly compensate[s] the victor for the expenses of the litigation."  *Id*. at 544.  This interest is due from the date of this judgment until the attorneys' fees are paid in full.

## V. CONCLUSION

In sum, the Court concludes that the Trustee adduced very credible testimony and introduced very reliable exhibits that the Payments made to Option One were fraudulent transfers.  Additionally, the Court concludes that Option One's trial strategy of offering no evidence, but merely arguing that the Trustee did not meet his burden of proof, has failed. Therefore, the Court will order that all Payments made to Option One within four years of filing the complaint alleging fraudulent transfers, totaling $63,582.20, shall be returned to the Trustee for the benefit of the creditors of this bankruptcy estate.  Because the Trustee's constructive trust argument fails, this Court will not award the Trustee the entire $90,668.08 that he seeks.  This Court will, however, award pre-judgment interest in the amount of $2,978.78.  Further, the Trustee is entitled to post-judgment interest at a rate of 5% per annum on the sum of the following: (1) the principal amount, or $63,582.20; (2) the amount of pre-judgment interest, which is $2,978.78; and (3) the ultimate award of attorneys' fees, to be determined later.  This post-judgment interest accrues from the date of the judgment until the date the judgment is completely satisfied.  Lastly, the Court awards the reasonable attorneys' fees and costs incurred by the Trustee.

34

A judgment consistent with this Memorandum Opinion will be entered on the docket simultaneously with the entry of this Opinion.

Signed on this 7th day of July, 2009.

Jeff Bohm
United States Bankruptcy Judge